Below is an Opinion of the Court.

_____
TRISH M. BROWN
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re ) | Case No. 08-32798-tmb11 |
| ) | |
| MATRIX DEVELOPMENT CORPORATION, ) | MEMORANDUM OPINION |
| ) | |
| Debtor. ) | |

This matter came before the court for hearing on June 30, 2009, on an objection by the Debtor to the election by Wachovia Financial Services, Inc. and KeyBank, N.A. (collectively the "Electing Creditors") to have their claims treated as fully secured under section 1111(b)(2) of the Bankruptcy Code.[1] The Debtor was represented by Sanford R. Landress. Wachovia Financial Services, Inc., was represented by J. Michael Booe. KeyBank, N.A. was represented by Mary Jo Heston.

I have reviewed my notes, the exhibits, and the pleadings and other submissions in the file. I also have read applicable legal authorities, both as cited to me and as located through my own research. I have considered carefully the arguments presented and have read counsels' submissions in detail. The following findings of fact and legal conclusions constitute the court's findings under Federal Rule of Civil Procedure 52(a), applicable in this proceeding under Federal Rule of Bankruptcy Procedure 9014. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the

---

[1] Unless otherwise stated, all references to "sections" refer to the Bankruptcy Code, 11 U.S.C. § 101 et seq.

Page 1 - MEMORANDUM OPINION

conclusions of law constitute findings of fact, they are adopted as such.

## DEBTOR'S PROPOSED PLAN

Under the Debtor's proposed plan [Dkt. 1033], filed on March 31, 2009, (hereinafter referred to as "the Plan"), each claim that is secured by a lien on the Debtor's property is placed in a separate class or subclass. Some of the claims are secured by property that is or will be abandoned by the Debtor and the lenders may exercise their foreclosure remedies with regard to these properties. The remaining claims are secured by real property that the Debtor intends to retain. Under the Plan, the Debtor will continue development of the retained properties and the developed properties will be sold as individual units. The Debtor describes the proposed sales as sales of "completed inventory in the ordinary course of business." Debtor states that it will amend the Plan to provide that "in the event that any property in a Retained Project is to be sold by the Reorganized Debtor other than in the ordinary course of business and if, at such time, the Lender's Claim secured by a lien on such property, including any portion thereof that is a [general unsecured claim], remains unsatisfied, such sale shall be subject to the Lender's rights, if any, under section 363(k) of the Bankruptcy Code to credit bid at such sale." (Debtor's Obj. at 6). It is with respect to the retained properties that the Electing Creditors seek to exercise their § 1111(b)(2) election rights.

## LEGAL ANALYSIS

Section 1111(b) provides:

"(b)(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless
    (i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or
    (ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.
(B) A class of claims may not elect application of paragraph (2) of this subsection if—
    (i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or
    (ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.

Page 2 - MEMORANDUM OPINION

(2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed."

The Debtor, relying on the language of section 1111(b)(1)(B)(ii), contends that the Electing Creditors' § 1111(b)(2) elections are improper as they hold recourse claims and those claims are secured by liens on property that is to be sold under the Plan. The Electing Creditors disagree. They contend that the "ordinary course" sales proposed by the Debtor are not sales within the meaning of §1111(b)(1)(B)(ii) and, therefore, have no bearing on their right to make a § 1111(b)(2) election.

Section 1111(b)(1)(B)(ii) does not provide that a creditor is deprived of its § 1111(b)(2) election rights by <u>any</u> sale of its collateral. Rather, it prohibits a recourse creditor from making a § 1111(b)(2) election only where the creditor's collateral is sold "under section 363" or "under the plan." Unfortunately, the statute provides no guidance as to what constitutes a sale "under the plan."

The Electing Creditors contend that, at a minimum, a sale "under the plan" requires that they be allowed to credit bid at the sale of their collateral. In addition, they contend that a sale "under the plan" must occur substantially contemporaneously with confirmation of the plan and that the plan must set forth the specifics of the sale, including the name of the buyer, the closing price and other terms, and an anticipated closing date. The Plan provides none of this information with respect to any of the proposed sales.

The Debtor concedes that the issue of whether a secured creditor is allowed to credit bid on sale of its collateral is "closely related" to its right to make a § 1111(b)(2) election. However, it contends that the issue of whether the Electing Creditors have the right to credit bid is not currently before the court and "will be ripe for judicial determination only if a Lender rejects the Plan and objects to confirmation of the Plan on the grounds that its credit bid rights are not properly protected or preserved under the Plan." (Debtor's Obj. at 7). The Debtor is correct in its assertion that the issue of whether the Plan is confirmable is not currently before the court. However, the fact that the Plan proposes "ordinary course" sales, with no right of credit bid granted to the Electing Creditors upon the sale of their collateral, is central to the issue of whether those creditors have the right to make a § 1111(b)(2) election.

Other courts have concluded that § 1111(b) cannot be clearly understood without reference to its

Page 3 - MEMORANDUM OPINION

legislative history. See, e.g., In re 222 Liberty Associates, 108 B.R. 971, 979 (Bankr. E.D. Pa. 1990), in which the court stated:

> "[w]e decline to find that the language of § 1111(b) is so plain on its face that Congress' intent can be clearly understood without reference to the legislative history. The fact that commentators such as Collier and other courts interpreting § 1111(b) all refer to the legislative history when construing the section, supports our belief that the language, or the 'natural reading,' of the section is not so clear that reference to the legislative history is not necessary. See In re Realty Investments, Ltd. V, 72 B.R. 143, 145 (Bankr.C.D.Cal.1987) (the court 'struggled with the language of § 1111(b)(1)(B)(ii) . . .'); and In re Woodridge North Apts., Ltd., 71 B.R. 189, 191 (Bankr.N.D.Cal.1987) (discussing § 1111(b), the court states that '[t]he language of the Bankruptcy Code does not provide a clear answer.')" Id. at 978-79.

I agree that § 1111(b) cannot be understood without reference to its legislative history, particularly since the phrase "under the plan" is not defined by the statute.

In Woodridge North Apts., Ltd., 71 B.R. 189, (Bankr.N.D.Cal. 1987), the court concluded that:

> "The purpose of section 1111(b) also requires that a lienholder be permitted to credit bit. The provision was enacted in response to the decision in Great Nat'l Life Ins. Co. v. Pine Gate Associates, Ltd., 2 B.C.D. 1478 (Bankr.N.D.Ga.1977). Pine Gate arose under chapter XII of the Bankruptcy Act of 1898. In that case, the court allowed debtor to retain property subject to a secured, nonrecourse note by paying the creditor only the fair market value of the property as determined by the court.
>
> The Pine Gate decision was criticized on two grounds. First, it imposes on the secured creditor the entire risk of undervaluation of the collateral by the Bankruptcy Court. See 5 L. King, C. Cyr, K. Klee, H. Minkel & W. Taggart, Collier on Bankruptcy, ¶ 1111.02 at 1111-16 to 17 (15th ed. 1986) (hereinafter Collier); J. Stein, Section 1111(b): Providing Undersecured Creditors with Postpetition Appreciation, 56 Am.Bankr.L.J. 195, 200-01 (1982) (hereinafter Stein). Second, it permits the debtor or trustee to secure the exclusive benefits of any future appreciation of the collateral. See Collier, supra, at 1111-18; Stein, supra, at 200-01. The latter factor can be of considerable importance where the value of the collateral is temporarily depressed at the time of the court's determination because of a downturn in the business cycle." In re Woodridge North Apts., Ltd., 71 B.R. 189, 191-192 (Bankr.N.D.Cal.1987).

Section 1111(b) sought to remedy the Pine Gate problem by changing the way undersecured creditors were treated in a Chapter 11 case. First, § 1111(b)(1)(A) converts nonrecourse debt into recourse debt, giving undersecured nonrecourse creditors a secured claim for the value of their collateral and an unsecured deficiency claim for the balance owed to them. Second, § 1111(b)(2) allows an undersecured recourse creditor to elect to have its claim treated as fully secured. If such an election is made, the debtor may only retain the creditor's collateral by paying the creditor the full amount of its claim. There are, however, restrictions on both the conversion of nonrecourse debt into recourse debt and a creditor's right to

Page 4 - MEMORANDUM OPINION

elect to have its claim treated as fully secured. Under § 1111(b)(1)(A) a nonrecourse claim is not converted to a recourse claim if the class to which the claim belongs elects to have its claims treated as fully secured under § 1111(b)(2) or if the collateral securing the claim is to be sold "under section 363" or "under the plan." Similarly, a recourse creditor may not elect to have its claim treated as fully secured if the collateral securing the claim is to be sold "under section 363" or "under the plan."

Although the language of § 1111(b) gives no guidance as to what constitutes a sale "under the plan," case law, relying on the legislative history of § 1111(b) supports the Electing Creditors' contention that the sale exception to that section is only applicable if the effected creditor is allowed to credit bid at the sale of its collateral. See e.g., In re Woodridge North Apts., Ltd. supra, at 191 ("Sale of property under section 363 or under the plan is excluded from treatment under section 1111(b) because of the secured party's right to bid in the full amount of his allowed claim at any sale of collateral under section 363(k) of the House Amendment. 124 Cong. Rec. H11, 104 (daily ed., Sept. 28, 1978); 124 Cong. Rec. S17, 420 (daily ed., October 6, 1978)."); In re Waterways Barge Partnership, 104 B.R. 776, 782 (Bankr. N.D. Miss. 1989) ("the reason for inclusion of the exception contained in section 1111(b)(1)(B)(ii) is that a secured creditor who has the opportunity to protect his position by bidding in debt at the sale of his collateral and recovering his collateral, has the benefit of his bargain and requires no special protection."); Tampa Bay Associates, Ltd., v. DRW Worthington, Ltd. (In re Tampa Bay Associates, Ltd.), 864 F.2d 47, 50 (5th Cir. 1989) ("Section 1111(b)(1)(A)(ii) explicitly excepts from the election option any nonrecourse holder whose secured property is sold pursuant to 11 U.S.C. § 363 or pursuant to a plan of reorganization. Through these exceptions it appears that Congress intended to protect the nonrecourse undersecured creditor only if such a creditor is not permitted to purchase the collateral at a sale or if the debtor intends to retain the collateral after bankruptcy and not repay the debt in full. The legislative history verifies this congressional intent in limiting the applicability of the statutory recourse status: 'Sale of property under section 363 or under the plan is excluded from treatment under section 1111(b) because of the secured party's right to bid in the full amount of his allowed claim at any sale of the collateral under section 363(k) . . . .'") (citations omitted); and John Hancock Mutual Life Ins. Co. v California Hancock, Inc. (In re California Hancock,), 88 B.R. 226, 230 (9th

Page 5 - MEMORANDUM OPINION

Cir. BAP 1988)("'the sale exception to section 1111(b)(1)(A) applies only where the lienholder is allowed to credit bid.'")

Although the majority of the cases that have discussed the sale exception in § 1111(b) have done so in the context of whether a **nonrecourse** creditor is barred from having its claim treated as a recourse claim under § 1111(b)(1)(A)(ii), the analysis appears to be equally applicable to **recourse** creditors electing § 1111(b)(2) treatment under § 1111(b)(1)(B). See 7 Collier on Bankruptcy, 15th Ed. ¶ 1111.03[3][b]:

> "Section 1111(b)(1)(B) contains an additional restriction upon the exercise of the section 1111(b)(2) election. Section 1111(b)(1)(B)(ii) states that a class may not exercise the election if the holder of a claim of the class has recourse against the debtor on account of the claim and the property is sold under section 363 of this title or is to be sold under the plan.
>
> As previously noted in connection with section 1111(b)(1)(A)(i), the reason for the inclusion of the exception contained in section 1111(b)(1)(B)(ii) is that a secured creditor has the opportunity to protect its position. It may bid its debt at the sale of the collateral and recover the collateral. This ability gives it the benefit of its bargain and requires no special protection."

In Waterways Barge Partnership, supra, 104 B.R. at 782, the court found that:

> "The identical reasoning, applicable to the nonrecourse creditor who has ostensibly lost its recourse status afforded pursuant to 1111(b)(1)(A) because of a proposed sale of the secured property under the plan, can be applied to the **recourse creditor** who has ostensibly lost the right to make an § 1111(b)(2) election because of a proposed sale of the secured property under the plan. A literal reading of the statute, without reviewing the legislative history or carefully analyzing those decisions dealing with nonrecourse creditors, can result in a misunderstanding of the statute . . . .
>
> . . . .
>
> The option available to the recourse undersecured creditor who wishes to have his claim treated as fully secured is the § 1111(b)(2) election. Regardless of whether the secured property is proposed to be sold under the plan, if the undersecured **recourse creditor** is not permitted to 'credit bid' its claim, it is not precluded from making the § 1111(b)(2) election, regardless of the literal prohibition set forth in § 1111(b)(1)(B)(ii)." (emphasis in original).

In the Matter of 183 Lorraine Street Associates, 198 B.R. 16, 27 (Bankr. E.D.N.Y. 1996), the court stated:

> "The purpose of the section 1111(b)(2) election is to protect secured creditors from depreciations in the market value of property securing claims. Otherwise, mortgagors could reduce their mortgage obligations during market contractions by filing Chapter 11 reorganization petitions, obtaining depressed valuations of their mortgaged property, giving mortgagees the cash equivalent of the secured portion of their claims, and treating the deficiency claims the same as the claims of other general unsecured creditors generally by giving them a small pro rata percentage distribution. Section 1111(b)(2) protects mortgagees from this type of opportunism by giving them the option of maintaining the fully secured

Page 6 - MEMORANDUM OPINION

nature of their claims in case the mortgaged property is retained by the debtor after reorganization.

See In re 680 Fifth Avenue Assocs., 29 F.3d 95 (2nd Cir. 1994)."

See also H & M Parmely Farms v. Farmer's Home Admin., 127 B.R. 644 (D.S.D. 1990) ("In the event the debtor desires to sell the property, the recourse creditor [making a 1111(b)(2) election] could bid in debt at a fair and adequate sale, recover the collateral and submit a deficiency claim against the bankruptcy estate.")

Case law also supports the Electing Creditors' contention that the § 1111(b) sale "under the plan" exception only applies where the plan provides for an auction of the creditor's collateral or, if the sale is to be a private sale, discloses the specifics of the sale, including the name of the purchaser, the sale price, the proposed closing date, other terms of the sale, and where the proposed sale will occur substantially contemporaneously with plan confirmation.

In Western Real Estate Fund, Inc., 75 B.R. 580 (Bankr. W.D. Okla. 1987) the court addressed the issue of whether undersecured nonrecourse creditors were deprived of their § 1111(b)(1)(A) recourse status under the sale exception contained in § 1111(b)(1)(A)(ii) where the Debtor's plan provided for sales of the creditors' collateral but failed to specify the sale date or a sale price and failed to identify a proposed purchaser. The court concluded that the proposed sales were not sales within the meaning of § 1111(b)(1)(A)(ii), noting:

> "The plans before the court, while mandating the sale of all properties, are totally without specificity as to the details of the sale, including when the sale must take place, the identity of the purchaser and the price to be obtained. While the debtors, by capitalizing their projections of future income, have generated projections of future values for each of the properties, the plans do not require, or commit the debtors to, the sale of any property at any particular price or at or before the date for which the projected future valuation is made.
>
> Thus, the debtors, by the simple expedient of requiring the sale of all properties after confirmation, have deprived non-recourse creditors of the preferred status of recourse treatment which would otherwise be conferred upon them by § 1111(b)(1)(A). The loss of this 'conversion' to recourse treatment, in turn, means that the undersecured non-recourse creditor remains non-recourse, has no unsecured component to its claim and is limited to the secured claim to the extent of the § 506(a) value assigned to the property by the court . . . .

Page 7 - MEMORANDUM OPINION

. . . .

> This result is wholly lacking in fairness. Debtors should not be permitted to deprive objecting non-recourse undersecured creditors of the valuable rights which would be conferred upon them under § 1111(b)(1) by simply providing for the sale of the property at some unspecified future time, to some unspecified purchaser, at an unspecified price and on unspecified terms." Id. at 588-589.

The Western Real Estate court declined to determine the outside length of time which could transpire between confirmation and a proposed sale or the "degree of specificity required in the terms and conditions of any proposed sale in order to permit the application of the § 1111(b)(1)(A)(ii) exception to the 'preferred status' afforded by § 1111(b)(1)(A)" but concluded that "where the provision for the sale of property securing a lien . . . is as wholly lacking in specificity as is the case here, the exception contained in § 1111(b)(1)(A)(ii) may not be found to be applicable . . . ." Id. at 589.

The court addressed a similar issue in In re Georgetown Park Apts. Ltd., 103 B.R. 248, 250 (Bankr. S.D. Cal. 1989). In Georgetown Park, First City Bank of Austin, Texas ("First City"), an undersecured nonrecourse creditor objected to the debtor's disclosure statement on the grounds that the plan was not confirmable as a matter of law. Under the plan the debtor proposed to pay First City the value of its collateral, an apartment building whose value the debtor estimated at $2.4 million, and discharge the balance of First City's unsecured deficiency claim. The plan provided that the debtor would hold the apartment building for four years during which the debtor anticipated that the value of the property would increase to over $3 million. Under its plan, it would then sell the property at a "private sale" which was to occur no later than May 30, 1993. The debtor contended that it need not provide for First City's deficiency claim because of the sale exception contained in § 1111(b)(1)(A)(ii). First City disagreed, contending that the proposed sale of its collateral was not a "sale" within the meaning of § 1111(b)(1)(A)(ii).

The court agreed with First City, finding that the "sale" proposed in the debtor's plan did not deprive the creditors of their 1111(b) rights. In doing so it agreed with the objecting creditor that the proposed delay in sale of the collateral assigned the entire risk of fluctuations in the market to the creditor and was inconsistent with the rationale for the sale exception, which is:

Page 8 - MEMORANDUM OPINION

> "that where equity holders are not speculating on future appreciation of an asset, but rather are selling it under the plan, undersecured non-recourse creditors do not need the protection of an unsecured recourse deficiency claim. Rather, the market determines the collateral's value and the creditors' liens will be satisfied before the equity holders realize any of that value." Id. at 249.

The court concluded that "[w]here this market determination is delayed because the sale is delayed-here, for four years-the debtor's equity holders are speculating on future appreciation of the property without any compensating benefit to the undersecured non-recourse creditor. This violates the purpose for the 1111(b)(1)(A)(ii) exception." Ultimately the court concluded:

> "[I]t may well be that the [sale] exception is only available in those circumstances where the debtor has proposed a sale (under § 363 or pursuant to a plan) at a public auction or under a binding contract of sale to an identifiable buyer at a time substantially contemporaneous with confirmation. Since this debtor's plan proposes neither, it impermissibly deprives First City of the unsecured recourse claim it is entitled to assert pursuant to § 1111(b)(1)(A)."

The Debtor concedes the majority of the published decisions construing § 1111(b) support the Electing Creditors' contention that they are entitled to a § 1111(b)(2) election. In fact, the Debtor cited no cases to support its position that the sale exception to § 1111(b) applies where a creditor is denied its right to credit bid. It argues, however, that the purpose of requiring that a creditor be allowed to credit bid at a sale of its collateral was to prevent an unscrupulous debtor from taking advantage of a down market to cash out a creditor at less than the amount of its claim while retaining the creditor's collateral, and any possible increase in its value for the debtor's benefit. In the instant case, it argues, because its survival depends on developing and selling the retained properties as quickly as possible, there is no possibility that it will sit on the properties waiting for the market to improve in order to swipe the upside of that market for itself. In addition, the Debtor points out that it has committed a minimum of $12 million to pay unsecured creditor claims, including the undersecured recourse claims of the Electing Creditors, and that this amount will increase if the properties sell for an amount in excess of the value set for those properties under § 506. Accordingly, it argues, there is no "air of abuse" in this case and this court should therefore decline to follow the analysis of the reported decisions.

There are a number of problems with this analysis. First, legislative history specifically states that

Page 9 - MEMORANDUM OPINION

the sale exception was included in § 1111(b) because the legislature believed that no special protection was needed for secured creditors who retained their credit bid rights. I cannot simply ignore that history. The legislative history of § 1111(b) also shows that the statute was intended to protect the benefit bargained for by secured creditors. Curbing debtor abuse might have been a part of the legislative goal in adopting § 1111(b), however, there is nothing in the legislative history to show that it was the only purpose of the statute. Finally, the Debtor's argument that it intends to share the benefit of any up-turn in the market by increasing the payout to unsecured creditors ignores the fact that there are multiple creditors in this case with claims against different properties. Under the Plan, any increase in distribution to unsecured creditors as a result of an increase in the value of one creditor's collateral would be spread - pro rata - among all unsecured and undersecured creditors, rather than accruing only to the benefit of the creditor whose collateral increased in value. This would not meet Congress's goal of ensuring that each individual secured creditor retain the benefit of its bargain. Accordingly, I decline the Debtor's invitation to depart from the rationale of the cited cases.

Section 1111(b) was enacted to protect the rights of secured creditors by ensuring that they either received full payment of their allowed claims or retained the right to retake their collateral via a credit bid at a sale, either under § 363 or under the Plan. Under the sales proposed in the Plan the secured creditors would not be allowed to credit bid upon sale of their collateral. Further, while the Plan provides for the sale of the Electing Creditors collateral at some future time, the Plan contains no specifics as to the terms of those sales or even when the sales are to occur. I conclude, therefore, that the "ordinary course" sales proposed by the Debtor are not sales "under the plan" within the meaning of § 1111(b). The Debtor's objection to the Electing Creditors' Notices of Election is, therefore, overruled.

Page 10 - MEMORANDUM OPINION

Mr. Booe and Ms. Heston should submit orders within 10 days of this opinion.

###

cc: Sanford R. Landress
Matthew Goldberg
Mary Jo Heston
Jason Ayres
David Hancock

Page 11 - MEMORANDUM OPINION